**ADMIRALTY COATINGS CORPORATION,**
Petitioner,

v.

**William B. EMERY; Director, Office of Workers' Compensation Programs, United States Department of Labor,**
Respondents.

No. 97–2639.

United States Court of Appeals,
Fourth Circuit.

Argued: May 1, 2000

Decided: Sept. 21, 2000

**ARGUED:** F. Nash Bilisoly, IV, Vandeventer Black, L.L.P., Norfolk, Virginia, for Petitioner. Elizabeth Hopkins, United States Department of Labor, Washington, D.C.; Ralph Rabinowitz, Rabinowitz, Rafal, Swartz, Taliaferro & Gilbert, P.C., Norfolk, Virginia, for Respondents. **ON BRIEF:** Kelly Outten Stokes, Vandeventer Black, L.L.P., Norfolk, Virginia, for Petitioner. Marvin Krislov, Deputy Solicitor for National Operations, Allen H. Feldman, Associate Solicitor for Special Appellate and Supreme Court Litigation, United States Department of Labor, Washington, D.C., for Respondent Director.

Before WIDENER, NIEMEYER, and KING, Circuit Judges.

Petition for review denied by published opinion. Judge KING wrote the opinion, in which Judge WIDENER and Judge NIEMEYER joined.

KING, Circuit Judge:

Admiralty Coatings Corporation petitions for review of the Decision and Order of the Benefits Review Board ("BRB") awarding to William B. Emery, on a continuing basis, temporary partial disability benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA") for a shoulder injury sustained in the course of Emery's employment. For the reasons expressed below, we deny the petition for review and affirm the award of benefits.

## I.

On November 18, 1994, Emery was hurt while sandblasting inside a ship; a sudden increase in the air pressure delivered to the blaster hose caused the apparatus to jerk, partially tearing the supraspinatus tendon in Emery's right shoulder. Although Admiralty Coatings initially controverted its liability for this injury, it belatedly paid Emery temporary total disability benefits for the period November 23, 1994, through January 4, 1995. On this latter date, with no paycheck and no benefits yet forthcoming, Emery visited his treating orthopedist, Dr. Jack L. Siegel, seeking permission to return to work. Dr. Siegel dutifully examined Emery and granted his request.

Despite Dr. Siegel's authorization, Emery felt as though he could not resume work as a sandblaster, which is extremely heavy and physically demanding labor. Although the treatment regimen had improved his condition and most of the pain had subsided, Emery had not yet regained full strength in his shoulder, and he was concerned about the possibility of reinjury.

With return to his old job thus precluded, Emery accepted work as a spray painter with Main Industries on February 8, 1995. During his four-month tenure with Main, Emery saw Dr. Siegel on three occasions. On March 21, 1995, Emery reported only light, infrequent pain, for which

medication was unnecessary. He continued, however, to lack strength in his right shoulder, most notably when his arm was fully extended.

Within two weeks, the situation had changed. At Emery's next visit, on April 4, 1995, he complained of pain and discomfort in his shoulder. According to Dr. Siegel's report, Emery felt that his symptoms were "related to a strain recently at work trying to lift a can of paint in an overhead and forward position." J.A. 135.[1] Dr. Siegel noted "[e]xacerbation of right shoulder symptoms with mild bursitis and strain component." *Id.* Dr. Siegel administered an injection of painkillers which "helped tremendously," though Emery continued to report mild discomfort during his next visit, about six weeks later.

Emery was terminated from his painting job on June 1, 1995, after a confrontation with a co-worker. He was subsequently employed by JEMM Industries, Inc., from June 20, 1995, until October 26, 1995, when he was again dismissed. Toward the end of Emery's employment with JEMM, Dr. Siegel recommended that Emery undergo surgery to repair his shoulder. Although Emery worked about three weeks in April 1996 for yet another employer, he quit that job in anticipation of the surgery, which apparently has yet to occur because of the uncertainty as to whether and how the hospital will be paid.

Admiralty Coatings contested Emery's claim that he was entitled to medical and wage compensation beyond the six weeks of benefits paid on account of his temporary total disability, and the matter came on for hearing before an ALJ on May 29, 1996. By Decision and Order of November 4, 1996, the ALJ found Emery's shoulder problems to be the result of his employment with Admiralty Coatings, and he directed the employer to provide "any and all medical treatment and/or surgery needed for [Emery's] right shoulder." J.A. 212.[2] The BRB affirmed the ALJ's ruling on October 23, 1997. On November 26, 1997, Admiralty Coatings timely petitioned for our review.

## II.

### A.

Admiralty Coatings challenges the ALJ's authority to award temporary benefits beyond the date of the May 29, 1996 evidentiary hearing, contending that such a practice violates the mandate of the Administrative Procedure Act that all findings and conclusions be supported by the record evidence. *See* 5 U.S.C. § 557(c)(3) ("All decisions ... shall include a statement of (A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record...."). According to Admiralty Coatings, there is simply "no evidence" of Emery's disability having continued beyond the date of the hearing, and

---

1. At his deposition, Dr. Siegel explained that Emery had actually described three to five activities, including the lifting of the paint can, that had caused him pain on the job. Dr. Siegel more or less acknowledged that his report could be construed as documenting a single, traumatic incident causing a specific injury, but that such was not his intent. The report, Dr. Siegel said, had been transcribed from a tape recording, and he chose to relate the paint can incident as "the one issue that was most descriptive for me to include in a dictation." J.A. 95. The ALJ credited Dr. Siegel's testimony clarifying his position.

2. The ALJ also concluded that Emery had suffered a lingering temporary partial disability, but he rejected Emery's claims of a seriously impaired earning capacity. The ALJ found that Emery had simply chosen not to work during his periods of inactivity, and that his earning capacity was best illustrated by his employment with JEMM, during which he had earned $600 per week. Because Emery's average weekly wage as a sandblaster was $668.08, the ALJ found him entitled to a weekly benefit payment of only $45.39, representing two-thirds of the difference. *See* 33 U.S.C. § 908(e) (setting compensation rate). The ALJ determined Emery's eligibility for benefits to have commenced on October 26, 1995, and to have not terminated as of the November 4, 1996 order.

thus no basis to compel the ongoing payment of benefits.

We discern no merit in this argument. If the rationale urged by Admiralty Coatings were to prevail generally, the courts could never, for example, grant injunctive relief prospectively, because there would be "no evidence" today that the actions complained of would continue tomorrow. Likewise, courts would be precluded from awarding damages to injured plaintiffs for their future medical expenses, simply because these expenses had yet to be actually realized.

Courts, of course, issue injunctions and award future damages with some frequency, based on nothing more than evidence of the status quo and extrapolations that may be made therefrom. Indeed, principles of fairness, finality, and judicial economy dictate no higher threshold. Very few things can be known with absolute certitude; thus, we deal in the law—as in life—with probabilities, not certainties. That Emery's shoulder keeps him today from being a sandblaster is a pretty fair indication that, absent the sudden appearance in town of a tent revival, he will not be seeking work as a sandblaster tomorrow. It is not required that Emery appear before the ALJ each week, hat in hand, as a condition of receiving his benefit check.

■ Moreover, the LHWCA specifically authorizes continuing awards in situations such as Emery's. *See* 33 U.S.C. § 908(e) ("In case of temporary partial disability resulting in decrease of earning capacity the compensation ... [is] to be paid during the continuance of such disability, but shall not be paid for a period exceeding five years."). A temporary award may terminate sooner than five years upon a showing that the condition giving rise to the disability has reached its "maximum medical improvement"; at that point, if the "improvement" is less than full recovery, the claimant may receive a permanent dis-

ability award. *See Gilchrist v. Newport News Shipbuilding & Dry Dock Co.,* 135 F.3d 915, 917 (4th Cir.1998).

■ If, prior to the expiration of the five-year maximum, Admiralty Coatings believes that Emery has regained his pre-injury earning capacity (by, for example, returning to longshore work or obtaining another job with similar pay), or has otherwise reached his maximum medical improvement, it may move under 33 U.S.C. § 922 for a modification of the initial award. Admiralty Coatings maintains, however, that relief under § 922 is inadequate, because the statute forbids it from recouping any overpayments that may have occurred between the date that maximum medical improvement is reached and the date of the modification decision.[3] This potential "lag time," Admiralty Coatings argues, results in the abridgement of its due process right to a hearing prior to being deprived of its property.

To the contrary, the initial hearing before the ALJ and the subsequent appeals (to the BRB and this court) provided Admiralty Coatings with all the process that it is constitutionally due. The administrative claim procedure and the statutory scheme itself afforded Admiralty Coatings with ample notice of (1) Emery's assertion that his injury was ongoing; and (2) the prospect of continuing payments should the injury be determined to have arisen from the company's employment of Emery. Admiralty Coatings was thus given a full opportunity to controvert its liability and contest, if it could, the ongoing nature of Emery's injury. The potential collateral consequences of the company's failure to convince the factfinder of the merits of its case do not amount to a constitutional violation.

### B.

■ With doubt cast aside as to the constitutionality of the administrative process, the substantive question for our consideration is simply whether Emery's cur-

---

**3.** In the event that an employer would be liable for further benefits beyond the modifi-cation date, § 922 does permit it to deduct past overpayments from future benefits due.

rent shoulder condition was caused by the November 18, 1994 sandblasting incident, at which time he was employed by Admiralty Coatings. If so, then Admiralty Coatings is responsible for the costs of Emery's medical treatment and the award of temporary partial benefits. Admiralty Coatings denies causation, asserting that Emery's condition is instead the result of his work as a painter for Main Industries.

Admiralty Coatings maintains that the "aggravation rule" immunizes it from liability in this case. *See Director, OWCP v. Newport News Shipbuilding & Dry Dock Co.*, 138 F.3d 134, 138 (4th Cir.1998) ("Under the LHWCA's 'aggravation rule,' if an injury at work aggravates an employee's pre-existing disability, the employer is liable for the employee's entire resulting disability, not only the disability that would have been due to the work-related injury alone."). The rule is usually applied on behalf of claimants for the purpose of holding their current employer liable for benefits; in this case, however, Admiralty Coatings attempts to invoke the rule as a shield, arguing that Main Industries (against which Emery has filed no claim) is responsible for the compensation award.[4]

The ALJ ruled that Emery's current back problems were the natural progression of his initial injury, and that his employment with Main did not give rise to a supervening cause that would break the chain of relatedness between Emery's employment with Admiralty Coatings and his required surgery:

> Employer argues that there was a work-related aggravation of Claimant's shoulder injury after he returned as a painter in January 1995. I do not agree. The evidence shows that Claimant suffered a work-related injury to his right shoulder on November 18, 1994. All the physicians of record agree that he partially

tore a rotator cuff tendon. Moreover, the physicians agree that the tear never completely healed.

J.A. 211. The "physicians of record" were Dr. Siegel and Dr. Robert S. Neff (also an orthopedic surgeon), the latter of whom examined Emery on February 20, 1996.

In response to counsel's questioning at deposition, Dr. Siegel testified that

> there's probably a small component here of aggravation from the repetitive phenomena [*i.e.*, the back-and-forth arm motion required of a spray painter] ... but I would still—the majority of the— of the cause, from a scientific standpoint ... it's the underlying etiology of the shoulder problem which was present from the time of his first injury.... My feelings on the recurrence of his pain is based on the fact that this is a progression of the original underlying etiology of his shoulder pain and that the symptoms that he reported to me after finding a new position is not a reinjury or a new trauma.

J.A. 107–08. Dr. Siegel's testimony reiterated the position he had taken a few weeks earlier in a letter to counsel for Admiralty Coatings:

> To the best of my knowledge, Mr. Emery's present dysfunction, disability and pathology are related to his initial injury, and the disability after April 1995 is from the natural progression of the original work-related injury. Perhaps the wording in my note is a bit misleading [*see supra* note 1], but there is no question in my mind that all of this is a result from his initial problem and could have easily occurred without any "reaggravation, reinjury or new trauma."

J.A. 152.

Dr. Neff's evaluation was, in several respects, not inconsistent with that of Dr. Siegel. Neff opined that

---

4. The Director takes the position that we should reject, as a matter of law, the "defensive" use of the aggravation rule attempted in this case. *See* Br. of Dir. at 12–15. We note, however, that the Ninth Circuit has sanctioned the approach taken here by Admiralty Coatings. *See Kelaita v. Director, OWCP*, 799

F.2d 1308, 1310 (9th Cir.1986). Because we hold the ALJ's award of benefits to have been supported by substantial evidence in any event, we leave for another day the question of whether an employer may avail itself of the "aggravation rule defense."

had [Emery] gone back to work either as a sandblaster or as a painter, he would have continued right shoulder problems and the activities which he performed upon returning to his new job in January 1995 were responsible to some degree for his worsening of his right shoulder symptoms. Stated another way, had he not returned to any work activity but simply kept his arm by his side and performed any active significant use of the right upper extremity, he would probably not be having the symptoms which he is having at this time. His initial problem never, in my opinion, completely healed and the increased activity which resulted from him returning to a work environment in January 1995 caused his symptoms to recur and his right shoulder problem to be worse as a result of that employment than it was prior to returning to work.

J.A. 202. Contrary to the position taken by Dr. Siegel, however, Neff determined that Emery's "current condition is not the natural progression of his initial work injury absent the second job but is a result of the initial work injury plus the second job." J.A. 203. With regard to the above conclusion, the ALJ observed:

Dr. Neff's reasoning escapes me. He does not explain how a limb which he feels has been rendered useless for working purposes by the first injury can somehow be rendered more useless for working purposes later. Rather, I find that the weight of the credible medical evidence as shown by Dr. Siegel's opinions and testimony compels a conclusion that Claimant's right shoulder disability results from the natural progression of Claimant's November 1994 injury, notwithstanding Claimant's subsequent symptoms of shoulder pain and weakness while working later as a painter.

J.A. 212.

The ALJ's analysis was on target. The "aggravation rule" might apply, if at all, to a situation where a second trauma occurs in an area first injured during the claimant's prior employment, but since healed to the extent possible. In that instance, the subsequent employer is justifiably responsible for the entire resultant injury, even if the consequences of that injury are made worse by virtue of the area having been previously weakened or otherwise adversely affected.

Here, however, as Dr. Siegel opined and the ALJ found, there was no "second trauma"; instead, there was simply an onset of complications from the *first* trauma. Admiralty Coatings may be chagrined about Dr. Siegel's failure to successfully treat Emery's condition at the outset, but it appropriately bears the risk of that eventuality. The ALJ's award of benefits is therefore supported by substantial evidence.

### III.

In accordance with the foregoing, we deny the petition for review and affirm the benefit award.

*PETITION FOR REVIEW DENIED*