United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 31, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-60598
_____

OPERATORS & CONSULTING SERVICES, INCORPORATED; ZURICH
AMERICAN INSURANCE COMPANY,

Petitioners

v.

DIRECTOR, OFFICE OF WORKER'S COMPENSATION PROGRAMS, US
DEPARTMENT OF LABOR; DANOS & CUROLE MARINE CONTRACTORS
INCORPORATED; GRAY INSURANCE COMPANY; JAMES MORRISON,

Respondents

_____

Petition for Review:
Benefits Review Board
No. 03-0541
_____

Before JONES, Chief Judge, and KING and DENNIS, Circuit Judges.

KING, Circuit Judge:[*]

Petitioners Operators & Consulting Services, Incorporated

and Zurich American Insurance Company seek review of an order of

the Department of Labor's Benefits Review Board.  In this order,

the Benefits Review Board affirmed the decision of an

administrative law judge which imposed an employee's medical

---

[*]  Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

costs and disability payments upon Operators & Consulting Services under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 <u>et seq.</u> The petitioners argue that the Benefits Review Board misapplied the "aggravation rule" and erroneously concluded that the decision of the administrative law judge was supported by substantial evidence. For the reasons provided below, this petition for review is DENIED and the decision of the Benefits Review Board is AFFIRMED.

## I. BACKGROUND

### A. Factual Background

Pursuant to a contract with Burlington Resources ("Burlington"), petitioner Operators & Consulting Services, Inc. ("OCS") provided workers to operate an offshore oil platform. OCS hired claimant-respondent James Morrison ("Morrison") to repair mechanical equipment on this platform. On October 16, 1997, Morrison injured his back while using a ladder on the platform.[1] One week after his injury, Morrison sought treatment from a chiropractor, Dr. Karri Gramlich ("Gramlich"), who treated Morrison on a regular basis until February 1998. After the accident, Morrison quickly returned to work. Initially restricted to light-duty work, he soon resumed his regular course of activity on the platform, although he continued to experience

---

[1] More specifically, Morrison testified that he injured his back as he swung over a tall guardrail while climbing down a ladder on a water tank.

back pain.  In February 1998, Gramlich cleared Morrison to return to the full scope of his previous duties and ceased to treat him, although Morrison continued to complain of discomfort and pain.

In May 1998, Burlington ended its contract with OCS and contracted with respondent Danos & Curole Marine Contractors, Inc. ("Danos & Curole") to provide similar services.  Danos & Curole decided to retain Morrison in his position as field mechanic and formally hired him on May 8, 1998, after he successfully completed a pre-employment agility test.  Morrison's physical discomfort persisted, however, and he returned to Gramlich for treatment on May 22, 1998.

At this time, Morrison complained to Gramlich of the familiar pain in his lower back, but he also reported numbness and tingling pain in his leg, symptoms which first appeared in March 1998 (before he began working for Danos & Curole).  During the administrative hearing, Morrison testified that he was involved in several physically strenuous jobs while working for Danos & Curole, including a particularly arduous week in which he performed a total engine overhaul.  Following physically strenuous jobs, his back pain would increase, but his symptoms would lessen following rest.  Morrison also claimed that he did not think any specific event after the initial injury he suffered while working for OCS caused his condition to worsen, but rather that his back progressively "went down."

Gramlich continued this second round of treatment until September 1998.  Despite her efforts, Morrison's condition showed little improvement, and she eventually referred him to a neurosurgeon, Dr. Andrew Wilson ("Wilson").  Wilson began treating Morrison on September 15, 1998, but Morrison's condition continued to worsen, and Wilson advised him to consider surgery.  Because Morrison was unable to continue work, Danos & Curole terminated his employment on October 22, 1998.  At his administrative hearing, Morrison testified that his condition continued to deteriorate even after he stopped working for Danos & Curole despite the fact that he had wholly avoided strenuous physical activity.  Wilson's testimony generally tended to confirm Morrison's account.  After a series of diagnostic tests revealed a disc herniation and nerve root impingement, Wilson performed lumbar fusion surgery on July 9, 2001.  On June 6, 2002, Wilson declared that Morrison's condition had improved as much as possible, but that Morrison would be left with an eighteen percent whole body impairment, permanently limiting him to light-duty work in the future.

## B.    Procedural Background

Morrison filed claims for disability compensation and medical expenses against both OCS and Danos & Curole pursuant to the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. [hereinafter "LHWCA" or "Act"].  OCS voluntarily

4

paid Morrison temporary total disability compensation from September 23, 1998 to June 5, 2002; thereafter, OCS paid Morrison permanent partial disability and medical benefits. OCS asserted that Danos & Curole should be liable for all subsequent and further disability and medical benefits because Morrison's work for Danos & Curole aggravated his original condition. Danos & Curole denied responsibility for Morrison's disability, arguing that it resulted from the natural progression of the injury Morrison suffered on October 16, 1997, while working for OCS.

A formal administrative hearing was held before an administrative law judge ("ALJ") on January 23, 2003. The only issue considered at any length by the ALJ was which of the two employers--OCS or Danos & Curole--was responsible for Morrison's medical expenses and disability compensation. During the hearing, the ALJ considered testimony and evidence provided by Morrison, Gramlich, Wilson, Dr. Anthony Ioppolo, a neurosurgeon who examined Morrison on behalf of OCS on three different occasions, and Martin Knijn ("Knijn"), a physical therapist who conducted Morrison's pre-employment evaluation for Danos & Curole.

On April 16, 2003, the ALJ issued his decision. In this decision, the ALJ accepted Danos & Curole's arguments, finding both that Morrison's disability was attributable to the natural progression of the injury he suffered in October of 1997 while working for OCS and that his deteriorating back condition was not

aggravated during his brief employment with Danos & Curole. Guided in part by this court's en banc opinion in Strachan Shipping Co. v. Nash, 782 F.2d 513 (5th Cir. 1986), and based on Wilson's and Gramlich's testimony, as well as Morrison's own description of his symptoms, the ALJ concluded that Morrison's medical condition and resultant surgery were the consequence of his injury on October 16, 1997, and were neither caused nor aggravated by his subsequent employment with Danos & Curole. As a result, the ALJ held OCS responsible for all of Morrison's medical and disability benefits.

OCS appealed the ALJ's decision to the Department of Labor's Benefits Review Board ("BRB" or "Board"), which affirmed the ALJ's ruling on May 14, 2004. In its appeal, OCS essentially argued that the ALJ erred in failing to find that Morrison's underlying back condition was aggravated by his employment duties with Danos & Curole. The BRB rejected OCS's arguments, finding that the characterization of the record evidence and the assessment of the witnesses' credibility offered by OCS did not provide a basis for overturning the ALJ's credibility determinations and evaluation of the evidence.

The petitioners filed their initial petition for review with this court on July 12, 2004.

## II. DISCUSSION

6

The only seriously contested issue before the ALJ was which employer and carrier were liable for Morrison's disability. An administrative fact finder in a case such as this must apply the "aggravation rule," which requires a detailed examination of the case-specific medical evidence. "[T]he aggravation rule is a doctrine of general workers' compensation law which provides that, where an employment injury worsens or combines with a preexisting impairment to produce a disability greater than that which would have resulted from the employment injury alone, the entire resulting disability is compensable." Strachan, 782 F.2d at 517 (citing A. LARSON, LAW OF WORKMEN'S COMPENSATION (1982)); see also Ortco Contractors, Inc. v. Charpentier, 332 F.3d 283, 290 (5th Cir. 2003) (stating that an employer is liable under the aggravation rule when an employment injury creates, worsens, or combines with a preexisting condition to create a new and greater disability). Where the preexisting impairment results from an injury which occurred during the course of employment with a prior employer such as OCS, a second or final employer such as Danos & Curole is liable under the aggravation rule for the entire cost of an employee's disability if the preexisting impairment was aggravated during the course of the employee's second or final employment. On the other hand, a first employer such as OCS is liable if the employee's ultimate medical condition arises from the "natural progression" of an injury that

7

occurred during the course of the employee's first employment.[2]
<u>Metro. Stevedore Co. v. Crescent Wharf and Warehouse Co.</u>, 339 F.3d 1102, 1105 (9th Cir. 2003).

In <u>Strachan</u>, this court noted both that "the aggravation rule has been consistently applied by this Court in longshoremen cases" and that "the aggravation rule is well-grounded in the statutory language of the LHWCA"--specifically 33 U.S.C. § 903(a), which provides that "compensation shall be payable . . . in respect of disability or death of an employee," 33 U.S.C. § 902(10), which defines disability as "incapacity because of

---

[2] The aggravation rule is often known as the "last employer rule," although the two terms are probably not precisely interchangeable; rather, it may be more correct to say that the aggravation rule is the "two-injury branch" of the last employer rule. <u>See</u> <u>Found. Constructors, Inc. v. Dir., OWCP</u>, 950 F.2d 621, 623-24 (9th Cir. 1991) (discussing same); <u>see also</u> <u>Metro. Stevedore</u>, 339 F.3d at 1104-05 (discussing "two-injury" cases, "occupational disease" cases, aggravating or cumulative traumas, and the "last responsible employer rule").
Technical issues of nomenclature aside, it is clear that for the second or last employer to be liable in a case such as this, there must be evidence of additional trauma or damage that occurred in the course of the second or last employment. As the Fourth Circuit recently held in a case similar to the matter at hand,

> [t]he "aggravation rule" might apply . . . to a situation where a second trauma occurs in an area first injured during the claimant's prior employment, but since healed to the extent possible. In that instance, the subsequent employer is justifiably responsible for the entire resultant injury . . . . Here, however . . . the ALJ found . . . there was no "second trauma"; instead, there was simply an onset of complications from the <u>first</u> trauma.

<u>Admiralty Coatings Corp. v. Emery</u>, 228 F.3d 513, 518 (4th Cir. 2000). Here, as in <u>Admiralty Coatings</u>, the ALJ's factual finding that Morrison's back injury was not exacerbated by a second trauma fully accorded with the aggravation rule.

8

injury," and 33 U.S.C. § 908(f), which provides for payments to employees out of the industry-financed second injury fund. Strachan, 782 F.2d at 517. See also Louis Dreyfus Corp. v. Dir., OWCP, 125 F.3d 884, 887 (5th Cir. 1997) (stating that under the LHWCA, "employers are liable for the full costs of a worker's disability, even if the disability is the result of both a pre-existing impairment and a current employment injury; this is known as the 'aggravation rule'").

The aggravation rule is applied in the other circuits as well. See, e.g., Marinette Marine Corp. v. OWCP, 431 F.3d 1032, 1034 (7th Cir. 2005) (stating that under the aggravation rule, a subsequent employer is responsible if the subsequent employment aggravated an earlier injury, but that first employers are responsible if an employee's ultimate condition is attributable to the natural progression of the earlier injury); Metro. Stevedore, 339 F.3d at 1105 (stating that "[i]f the worker's ultimate disability is the result of the natural progression of the injury and would have occurred notwithstanding a subsequent injury, the employer of the worker on the date of the initial injury is the responsible employer").

The central task for appellate courts addressing petitions for review from administrative decisions that apply the aggravation rule is the "need to decide whether the ALJ's . . . finding is worthy of deference." Marinette, 431 F.3d at 1032. This court reviews "decisions of the Board to determine

9

only whether it 'correctly concluded that the Administrative Law Judge's order was supported by substantial evidence on the record as a whole and is in accordance with law.'" Conoco, Inc. v. Dir., OWCP, 194 F.3d 684, 687 (5th Cir. 1999) (quoting Ingalls Shipbuilding, Inc. v. Dir., OWCP, 991 F.2d 163, 165 (5th Cir. 1993)).

Substantial evidence in this context "is that relevant evidence--more than a scintilla but less than a preponderance--that would cause a reasonable person to accept the fact finding." Dir., OWCP v. Ingalls Shipbuilding, Inc., 125 F.3d 303, 305 (5th Cir. 1997) (citing Polanco v. City of Austin, 78 F.3d 968, 974 (5th Cir. 1996)). Because we lack "the expertise necessary to properly evaluate the complex and frequently conflicting testimony of neurological surgeons, orthopedists, and other medical experts . . . . we must leave this particular fact finding decision precisely where Congress placed it--with the ALJ." Ceres Marine Terminal v. Dir., OWCP, 118 F.3d 387, 391 (5th Cir. 1997). "It is fundamental that credibility determinations and the resolution of conflicting evidence are the prerogative of the fact finder, here the ALJ," and the ALJ "'is not bound to accept the opinion of any particular medical expert; he is entitled to weigh the medical evidence including the relative credibility of the competing experts . . . .'" Atl. Marine, Inc. v. Bruce, 661 F.2d 898, 900 (5th Cir. 1981) (internal citations omitted) (quoting Hullinghorst Indus., Inc.

10

<u>v. Carroll</u>, 650 F.2d 750, 759 (5th Cir. 1981)).  On the other hand, statutory interpretations and other decisions of law made by the BRB are reviewed by this court de novo.  <u>Cooper/T.Smith Stevedoring Co. v. Liuzza</u>, 293 F.3d 741, 744 (5th Cir. 2002) (citing <u>Equitable Equip. Co. v. Dir., OWCP</u>, 191 F.3d 630, 631 (5th Cir. 1999)).

The ALJ's decision to impose the costs of Morrison's injury upon OCS was supported by substantial evidence in the record, including, but by no means limited to, the testimony of Wilson and Gramlich.  Wilson observed that the flare-ups in pain Morrison suffered while he worked for Danos & Curole did not necessarily indicate that Morrison's disc was suffering further damage while he worked for Danos & Curole.  Rather, Wilson claimed that these flare-ups of pain were manifestations of the original physical damage that occurred while Morrison worked for OCS.  Although Wilson admitted that Morrison's employment with Danos & Curole <u>might</u> have exacerbated the damage Morrison suffered while working for OCS, he concluded that Morrison's ultimate condition was wholly attributable to the natural progression of his initial injury.[3]  <u>See, e.g.</u>, Wilson Dep. 71,

---

[3]  The following exchange provides a representative example of the evidence provided by Wilson's deposition:

WILSON:     Yeah.  In my mind it all flowed, and that's how he ended up getting an operation.  And because of the fact that he hurt himself, initially.

11

76, 86. Similarly, although Gramlich conceded that working for Danos & Curole might have exacerbated Morrison's condition, she concluded that Morrison's ultimate condition was wholly attributable to the original injury Morrison suffered while he was employed by OCS.[4] See, e.g., Gramlich Dep. at 41-42, 52.

QUESTION:     And it was a natural progression in your opinion?

WILSON:       Yes.

                    . . . .

WILSON:       If the question is, Do I think he hurt himself at the original time when he hurt himself in October [1997]. I guess, that's where I thought it all occurred. And I've had lots of patients do well and then they get worse and then they do better and then they get worse and then they eventually need an operation. These are all very interesting questions in terms of like, what was the final thing that broke the camel's back.

QUESTION:     And you just can't say that one way or the other, can you?

WILSON:       Except for the fact that he told me that he hurt his back at that one point in time. And that's where I'd say -- if I had to draw a line, I'd say, Okay, I'm drawing the line and the guy says he hurt his back here. And from that point on I met him and we did a lot of things to him and he's gone through a lot.

(Wilson Dep. 86, 101.)

[4] The following exchange provides a representative example of the evidence provided by Gramlich's deposition:

GRAMLICH:     My opinion is that the disk was created by the injury, the original injury.

We are neither doctors nor the original fact finders in this

---

QUESTION:      And had it not been for this, Mr. Morrison would not have required surgery; is that correct?

GRAMLICH:      That's correct. But again, I would refer to Dr. Wilson for his opinion since I don't do surgery.

QUESTION:      Based in your area of expertise, this would be your opinion?

GRAMLICH:      Yes.

. . . .

QUESTION:      Let's get this clarified. If we could just get something clarified. When you say symptoms are relieved, it does not necessarily mean that the underlying condition resolved itself satisfactorily?

GRAMLICH:      Correct.

QUESTION:      He may still have a bulging disk, but he may not be experiencing a great degree of symptomatology?

GRAMLICH:      Correct.

. . . .

QUESTION:      Doctor, during that preplacement evaluation [conducted by Knijn in May 1998], Mr. Morrison reported no pain or discomfort. Does that change your opinion regarding whether he was able to do those activities or whether those activities [at Danos & Curole] caused the related new symptomatology?

GRAMLICH:      I wasn't there with him. I still believe the accident created a disk problem in October of '97.

(Gramlich Dep. 41-42, 49, 51-52.)

13

matter, and so, under the appropriate standard of review, we need not assess the plausibility of these medical accounts, nor do we assess the weight they should be accorded relative to other evidence in the record.  See Pool Co. v. Cooper, 274 F.3d 173, 178 (5th Cir. 2001) (stating that "[l]ike the BRB, 'we may not substitute our judgment for that of the ALJ, nor reweigh or reappraise the evidence, but may only determine whether evidence exists to support the ALJ's findings'") (quoting New Thoughts Finishing Co. v. Chilton, 118 F.3d 1028, 1030-31 (5th Cir. 1997)).  Our task is more limited: we ask only whether this evidence was relevant to the ALJ's decision, and whether the ALJ's decision was reasonable based on this evidence.  Ceres, 118 F.3d at 389.  Wilson and Gramlich, who were ably cross-examined by OCS's counsel, concluded that Morrison's ultimate disability was the natural progression of the initial injury he suffered while working for OCS.  This evidence was directly relevant to the ALJ's decision, and the ALJ's decision was reasonable in light of this evidence; therefore, we hold that the BRB correctly found that the ALJ's decision was supported by substantial evidence.

### III.  CONCLUSION

For the reasons stated above, the petition for review is DENIED, and the decision of the BRB is AFFIRMED.